# IN UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | | |
|---|---|---|
| MARK A. BARRY, MD, | § | |
| Plaintiff, | § § § | |
| v. | § § | **Civil Action No. 14-104-RC** |
| MEDTRONIC, INC., | § § | **Judge Ron Clark** |
| Defendant. | § § § | |

# DEFENDANT MEDTRONIC, INC.'S MOTION TO COMPEL DISCOVERY
# DUE TO PLAINTIFF'S WAIVER OF THE ATTORNEY-CLIENT PRIVILEGE

*NY 245469368v3*

**TABLE OF CONTENTS**

I.     ARGUMENT ................................................................................................................. 2

       A.     Defendant's Inequitable Conduct Defense ........................................................... 2

       B.     Plaintiff's Assertions Of "Good Faith" And Lack Of Materiality Or Intent
              Waive The Attorney-Client Privilege .................................................................. 4

       C.     Plaintiff's Assertion Of A "Mistaken Description" Of Figure 6 In The
              Patents And Partial Disclosure Of Related Attorney-Client
              Communications Waives Privilege ...................................................................... 9

       D.     Plaintiff's Waiver Should Also Extend to Dr. Barry's Original Litigation
              Counsel And to the Pending Prosecution ........................................................... 12

II.    CONCLUSION ............................................................................................................ 14

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*,
    707 F. Supp. 2d 463 (D. Del. 2010) .................................................................................. 5, 8

*Echometer Co. v. Lufkin Indus., Inc.*,
    2002 WL 87323 (N.D. Tex. Jan. 16, 2002) ......................................................................... 11

*eTool Dev., Inc. v. Nat'l Semiconductor Corp.*,
    2011 WL 12677163 (E.D. Tex. Dec. 12, 2011) ............................................................. 13, 14

*eTool Dev., Inc. v. Nat'l Semiconductor Corp.*,
    No. 2:08-CV-196-DF (E.D. Tex. Nov. 29, 2011) ...................................................... 12, 13, 14

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
    732 F. Supp. 2d 653 (N.D. Tex. 2010) .................................................................................. 9

*In re Echostar Comm'ns Corp.*,
    448 F.3d 1294 (Fed. Cir. 2006) ............................................................................................ 11

*In re Method for Processing Ethanol Byproducts & Related Subsystems Patent Litig.*,
    2015 WL 2345635 (S.D. Ind. May 15, 2015) ........................................................................ 5

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) .......................................................................................... 8, 13

*Pall Corp. v. Cuno Inc.*,
    268 F.R.D. 167 (E.D.N.Y. 2010) ........................................................................................... 9

*Regeneron Pharms., Inc. v. Merus B.V.*,
    Case 1:14-cv-01650-KBF (S.D.N.Y. Aug. 6, 2015) ............................................................ 1, 4

*Regeneron Pharms., Inc. v. Merus B.V.*,
    Case 1:14-cv-01650-KBF (S.D.N.Y. Nov. 2, 2015) ............................................................... 6

*Regents of the Univ. of Cal. v. Micro Therapeutics, Inc.*,
    2007 WL 2069946 (N.D. Cal. July 13, 2007) ............................................................... 4, 6, 11

*Server Tech., Inc. v. American Power Conversion Corp.*,
    2011 WL 1447620 (D. Nev. Apr. 14, 2011) .......................................................................... 4

*The Medicines Co. v. Mylan Inc.*,
    936 F. Supp. 2d 894 (N.D. Ill. 2013) ................................................................................... 12

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011) .............................................................................................. 4

*Tyco Healthcare Group LP v. E-Z-EM, Inc.*,
    2010 WL 2079920 (E.D. Tex. May 24, 2010) ..................................................................... 13

*UUSI, LLC v. United States*,
    121 Fed. Cl. 218 (2015) ....................................................................................................... 11

*Willy v. Admin. Review Bd.*,
   423 F.3d 483 (5th Cir. 2005) ....................................................................................... 1, 9

Defendant Medtronic, Inc. ("Medtronic") respectfully files this motion seeking to compel the Plaintiff, Dr. Mark Barry, to provide discovery relating to Medtronic's inequitable conduct defense (*see* Amended Answer, Dkt. 62, ¶¶ 108-31), including a full and complete response to its Interrogatory No. 16, as well as all other related communications, documents, testimony and information based upon Plaintiff's waiver of the attorney-client privilege. Specifically, Medtronic has asserted that Dr. Barry and his prosecution counsel at the Gray Reed firm, including Mr. David Henry, have committed inequitable conduct by failing to disclose 21 highly material prior art surgeries[1] that practiced the alleged inventions of the patents-in-suit to the United States Patent and Trademark Office (the "PTO"). In trying to rebut Defendant's allegation of inequitable conduct, Plaintiff waived the attorney-client privilege by selectively disclosing some, but not all, of his communications with his counsel.

Despite this clear waiver of privilege, Dr. Barry and his counsel have invoked the attorney-client privilege and work product doctrine in an effort to prevent Medtronic from taking discovery regarding the subject matter of the waiver. However, "[a] longstanding legal principle based on fairness prevents the selective disclosure of evidence as a sword while using the shield of the attorney-client privilege to prevent testing of those assertions." *Regeneron Pharms., Inc. v. Merus B.V.*, Case 1:14-cv-01650-KBF, at 2 (S.D.N.Y. Aug. 6, 2015) (Dkt. 411) (Ex. A);[2] *see also Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("[W]hen a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."). In fact, at a July 23, 2015 hearing on Medtronic's Motion to Disqualify the Gray Reed Law Firm ("Motion to

---

[1] Dr. Barry also submitted for publication to the 11th International Meeting on Advanced Spine Techniques ("IMAST") the methodology and instrumentation used as well as the results of these 21 prior art surgeries. (*See* Dkt. 49-1; Dkt. 56-1).

[2] All exhibits referenced herein are attached to the Declaration of Allan A. Kassenoff In Support of Defendant Medtronic, Inc.'s Motion To Compel Discovery Due To Plaintiff's Waiver Of The Attorney-Client Privilege.

Disqualify") (Dkt. 54), the Court expressly cautioned Plaintiff against using this very tactic: "They can't be witnesses as a sword for Barry and at the same time say, 'Oh, we're attorneys. We're not going to tell what went on.'" (July 23, 2015 Hearing Tr. at 10:21-11:2; *see also id.* at 44:25-45:7, 46:18-23) (Ex. B). Yet, that is exactly what Plaintiff is seeking to do.

Moreover, as initially raised in Medtronic's Motion to Disqualify (at 3-8 & n.5), Plaintiff's waiver extends beyond the past prosecution of the patents-in-suit, but should also include the ongoing prosecution activities that Plaintiff and Mr. Henry initially concealed from the Court and Medtronic. Furthermore, the waiver extends to Plaintiff's original *litigation* counsel at the Gray Reed firm[3] based upon the admitted strategizing of the inequitable conduct issues with the Gray Reed attorneys that had been representing the Plaintiff in the instant case. (David G. Henry, Sr., Dep. Tr., 50:20-53:17, June 10, 2015 ("Henry Dep. Tr.")) (Ex. C).

Accordingly and as demonstrated further below, this Court should grant Medtronic's motion seeking to compel full and complete responses to its discovery requests, including Interrogatory No. 16, as well as all related communications, documents, testimony and information that concern or relate to the inequitable conduct issues raised herein.

I.  **ARGUMENT**

   A.  **Defendant's Inequitable Conduct Defense**

On July 20, 2015, Medtronic filed its Amended Answer which included an inequitable conduct defense and related counterclaim as to the three patents-in-suit. (Dkt. 62 at ¶¶ 108-31, 146-48; *see also* Medtronic's Answer to Plaintiff's First Amended Complaint (Dkt. 77) at ¶¶ 114-37, 152-54). As explained by Medtronic, Plaintiff and his prosecution counsel violated their

---

[3] To the extent that Plaintiff's second set of litigation counsel (Fish & Richardson) or his third set of litigation counsel (Kilpatrick Townsend & Stockton) were consulted on these issues, the waiver should extend to them as well.

respective duties of candor, disclosure and good faith while prosecuting the patents-in-suit. (*Id.*)

For example:

- Dr. Barry and his prosecution counsel, Mr. Henry, deliberately failed to disclose to the PTO, with deceptive intent, 21 prior art surgeries performed by Dr. Barry before the critical date and which practiced the alleged invention of the patents-in-suit.[4] (Dkt. 62 at ¶¶ 108-09; 111; 116-23; 125-30; Dkt. 77 at ¶¶ 114-15; 117; 122-29; 132-36).

- Mr. Henry made a conscious decision not to investigate, with deceptive intent, the dates of and/or commercial transactions associated with those prior art surgeries and/or corresponding instrumentation, despite knowing that they involved the alleged invention of the patents-in-suit and were potentially § 102(b) invalidating prior art, in order to avoid actual knowledge of such material information. (Dkt. 62 at ¶¶ 108-10; 117; 119; 122; 124-25; 127-31; Dkt. 77 at ¶¶ 114-16; 123; 125; 128; 129-31; 133-37).

In his reply to Medtronic's charge of inequitable conduct, Plaintiff generally denied the allegations, or merely stated that the deposition testimony and discovery responses cited by Medtronic "speak for themselves." (Dkt. 90 at ¶¶ 114-37). On September 4, 2015, Medtronic served Interrogatory No. 16, seeking information with respect to Dr. Barry's contention that neither he nor his prosecution counsel committed inequitable conduct:

> With respect to Medtronic's Defense and Counterclaim of Inequitable Conduct (*see* dkt. 72), describe in detail the basis or bases for Your contention(s) that neither You nor Your counsel, including specifically David Henry, have committed inequitable conduct before the U.S. Patent Office ("PTO") in connection with the prosecution of the Patents-in-Suit, as well as any related Barry patent applications, and identify all Documents, Things, and other evidence concerning such contention(s). . . .

(Defendant Medtronic, Inc.'s Second Set Of Interrogatories To Plaintiff (Nos. 13-16). Sept. 4, 2015) (Ex. D).

---

[4] The original application relating to the patents-in-suit was filed on December 30, 2004. However, Dr. Barry had conducted multiple surgeries using the method and apparatus of the alleged invention of this application more than one year earlier – as early as July 31, 2003 – thus qualifying as invalidating prior art under 35 U.S.C § 102(b). (Dkt. 50-4; Dkt. 50-1 at 2-3; Dkt. 50-3 at ¶ 12).

### B. Plaintiff's Assertions Of "Good Faith" And Lack Of Materiality Or Intent Waive The Attorney-Client Privilege

As a preliminary matter, courts have repeatedly held that a patentee cannot argue that it had a good faith belief for not disclosing certain prior art to the PTO, but then refuse to disclose the basis for such belief under the attorney-client privilege. *See, e.g., Server Tech., Inc. v. American Power Conversion Corp.*, 2011 WL 1447620, at *5 (D. Nev. Apr. 14, 2011) ("When parties' intent in providing documentation to the PTO is at issue, 'a party should not be permitted to testify about its state of mind at the time alleged privileged communication[s] occurred, without pointing to nonprivileged evidence to substantiate its claim or allowing the opposition to discover the privileged communications themselves.'") (citation omitted); *Regents of the Univ. of Cal. v. Micro Therapeutics, Inc.*, 2007 WL 2069946, at *4 (N.D. Cal. July 13, 2007) (holding that plaintiff's "claim of good faith puts squarely in issue the actions of [the prosecuting attorney] and the reasoning behind his decision not to disclose the thesis to the PTO. Therefore, any documents and/or materials that are probative as to [his] purported determination that the thesis was not publicly available are relevant in evaluating [plaintiff's] good faith defense."); *see also Regeneron Pharms., Inc.*, Case 1:14-cv-01650-KBF, at 2.

On October 8, 2015, Dr. Barry partially responded to Interrogatory No. 16, asserting that the withheld prior art surgeries were not "but-for" material[5] and that he and his counsel had "good-faith beliefs," thus negating a finding of inequitable conduct:

> Given the *lack of 'but-for' materiality* and the *good-faith beliefs and actions on the part of Dr. Barry and his counsel*, there is no evidence[6] whatsoever to support Medtronic's burden of proving inequitable conduct.

---

[5] "[A]s a general matter, the materiality required to establish inequitable conduct is but-for materiality. When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art. Hence, in assessing the materiality of a withheld reference, the court must determine whether the PTO would have allowed the claim if it had been aware of the undisclosed reference." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011).

(Plaintiff Mark A. Barry's Objections and Responses To Defendant Medtronic, Inc.'s Second Set of Interrogatories (Nos. 13-16), Oct. 8, 2015, ("Plaintiff's Second Interrogatory Responses") at 15 (emphasis added)) (Ex. E).  At the same time, however, Plaintiff did not – and will not – provide the basis for such "good-faith beliefs."  In other words, Dr. Barry is "attempting to use the advice of counsel both as a sword to defeat the intent prong of inequitable conduct and as a shield to prevent defendant[] from obtaining information to prove intent to withhold information from the PTO.  [He] cannot have it both ways." *Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, 707 F. Supp. 2d 463, 471 (D. Del. 2010) (waiver found where patentee responded to interrogatory by stating that "all individuals who had a duty of disclosure . . . believe in good faith that they fulfilled this duty to submit all information of which they were aware and acknowledged as material to patentability").

Dr. Barry also swore that neither he nor his counsel "intended to deceive" the PTO, and that they "provided all known material information" without any "deliberate decision" to "withhold any material" information:

> Neither *Dr. Barry*, nor to his knowledge, information and belief, *Mr. Henry, or anyone else associated with the prosecution of the Patents-in-Suit*, ever *intended to deceive* the Patent Office. Dr. Barry and his prosecution counsel, including Mr. Henry, *provided all known material information* to the Patent Office during the prosecution of the Patents-in-Suit so that there *was no deliberate decision to withhold any material, non-cumulative information*.

(Plaintiff's Second Interrogatory Responses at 13 (emphasis added)).  Dr. Barry's partial interrogatory response makes clear that Plaintiff's position is that neither he nor his prosecution counsel committed inequitable conduct based upon their state of mind.  However, "[c]ourts

---

[6] Plaintiff's argument that "there is no evidence whatsoever to support Medtronic's burden of proving inequitable conduct" further implicates waiver as any such evidence "would reside solely in attorney-client communications." *In re Method for Processing Ethanol Byproducts & Related Subsystems Patent Litig.*, 2015 WL 2345635, at *3 (S.D. Ind. May 15, 2015) ("Asserting advice of counsel, or emphasizing the defendants' lack of evidence on a particular issue – when that evidence by definition would reside solely in attorney-client communications – may implicate waiver principles.").

frequently conclude that a party waives the protection of the attorney-client privilege when the party voluntarily injects into suit a question that turns on state of mind." *Regents of the Univ. of Cal.*, 2007 WL 2069946, at *3. Moreover, Plaintiff's affirmative assertion of "good faith" and no "inten[t] to deceive" "'turns upon the subjective intention of the party claiming reliance and, therefore, *demands investigation into attorney-client communications* where such an intention would be manifested.'" *Id.* at *4 (quoting *United States v. Exxon Corp.*, 94 F.R.D. 246, 248 (D.D.C. 1981) (emphasis added)); *see also Regeneron Pharms., Inc. v. Merus B.V.*, Case 1:14-cv-01650-KBF, at 108 (S.D.N.Y. Nov. 2, 2015) (Dkt. 423) (Ex. F) ("By making the choice to maintain the privilege and withhold the documents, Regeneron chose the tactical path of not delving into state of mind or knowledge to defend against the claim of inequitable conduct.").

Plaintiff took a similar sword/shield approach in his earlier interrogatory responses wherein he disclosed having met with Mr. Henry and learning of the one-year grace period in the United States for any use or public disclosure of an invention:

> In mid-December of 2004, Dr. Barry contacted David Henry in Waco, Texas to begin work on seeking patent protection for the en bloc scoliosis correction method and devices. Knowing international patent protection depends on filing before any use or public disclosure of an invention, but that the U.S. has a one-year grace period, Dr. Barry forewent any foreign protection efforts and filed only a U.S. patent application in late December of 2004.

(Plaintiff Mark Barry's Amended Objections and Answers to Defendant Medtronic, Inc.'s First Set of Interrogatories, May 26, 2015, ("Plaintiff's First Interrogatory Responses") at 11) (Ex. G). At his deposition, Mr. Henry acknowledged that this "[o]ne year grace period, referring to a patent, generally would relate to Section 102 of the patent statute. . . . 102(b), yes." (Henry Dep. Tr. at 133:4-8) (Ex. C). However, he then refused to answer any other questions concerning his discussions with Dr. Barry as to § 102(b) on privilege grounds:

> Q. So you discussed the one-year grace period with Dr. Barry, did you not?
> A. I'm not going to talk about what I discussed with Dr. Barry.

(*Id.* at 133:9-12).

Dr. Barry has also waived privilege with respect to the 21 prior art surgeries as a result of Mr. Henry's deposition testimony regarding the timing of those surgeries. Specifically, as discussed above, Medtronic has alleged that Mr. Henry made a conscious decision not to investigate, with deceptive intent, the dates of these prior art surgeries despite knowing that they involved the alleged invention of the patents-in-suit in order to avoid actual knowledge of such material information. At his deposition, Mr. Henry refused to answer any questions as to whether he and Dr. Barry discussed the dates of the 21 prior art surgeries (each of which took place before the one-year bar date) on privilege grounds despite testifying that he had a good faith "understanding" that there were no prior art issues with such surgeries:

> Q. And in the application, you wrote that there were multiple surgeries before filing of the patent, correct?
> A. Right.
> Q. *And did you ask Dr. Barry when those surgeries took place?*
> A. *I'm not going into my conversations with Dr. Barry at that time. That's privileged communication.*
> Q. So sitting here today, you're not willing to testify as to whether or not you asked Dr. Barry about the dates of any prior surgeries he had performed?
> A. *I filed this application with an understanding that there were no issues related to prior art.*

(*Id.* at 127:20-128:9 (emphasis added)). Despite repeatedly testifying as to his good faith beliefs, Mr. Henry consistently refused to answer any question as to the basis for this conclusion:

> Q. Have you investigated to determine whether or not they used Dr. Barry's invention, those 21 surgeries in the IMAST presentation?
>
> MR. HEALEY: Instruction.
>
> A. We have analyzed information made available to us regarding the IMAST-related surgeries.
> Q. Okay. But you're unable to say one way or the other whether or not those surgeries used the invention?

> A. To the – to answer that question would be to reveal attorney work product, and you will be seeing our positions on that in responses and filings that are, frankly, going to be coming soon.

(*Id.* at 113:7-19).[7] Ultimately, Mr. Henry testified that he "always" complies with his duty of disclosure to the PTO, including with respect to prior public uses:

> A. I *always ask* clients whether an – whether an invention – first of all, when an invention was invented and *whether or not it had been put into use, publicly disclosed, sold*, all of – *that is my habit and practice in every patent case I'm involved with*.
> Do I recall a specific conversation with Dr. Barry through which I got the information on which I base this application? I do not recall that specific – the contents of that specific conversation. Nor do I believe that I can necessarily reveal that to you. However, I *always ask* clients whether or not – well everything I just listed.

(*Id.* at 129:14-25 (emphasis added)). But, despite testifying as to what he "always" does, Mr. Henry again invoked the attorney-client privilege as a shield in response to the question as to his discussions on this point with Dr. Barry:

> Q. Did Dr. Barry tell you that he had conducted surgeries using the invention more than a year before the filing date?
>
> MR. HEALEY: Instruction.
>
> A. I can't reveal that for privilege purposes. I can't respond to that.

(*Id.* at 130:1-6).

Mr. Henry's self-serving testimony of "always" complying with his duty of disclosure with regard to "every" application, while repeatedly refusing to talk about what actually

---

[7] Such a knowing withholding of Plaintiff's "positions" on the basis of privilege until after Mr. Henry's deposition, and then partially disclosing them in Dr. Barry's interrogatory responses – while still maintaining privilege as to key aspects of those positions – warrants a finding of waiver as to all such positions and related communications, as well as another deposition of Mr. Henry. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1374-75 (Fed. Cir. 2007) ("This broad scope [of waiver] is grounded in principles of fairness and serves to prevent a party from simultaneously using the privilege as both a sword and a shield; that is, it prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones."); *Brigham & Women's Hosp. Inc. v. Teva Pharm. USA, Inc.*, 707 F. Supp. 2d 463, 472 (D. Del. 2010) ("Here, plaintiffs have waived the attorney-client privilege as to information related to their failure to disclose the '244 Application to the patent examiners . . . . To the extent that defendants need to redepose certain individuals, such as [the prosecuting attorney], to elicit information previously withheld on the ground of attorney-client privilege, they may do so.").

happened in the instant case, is a classic example of a sword/shield waiver of privilege. *See Pall Corp. v. Cuno Inc.*, 268 F.R.D. 167, 170 (E.D.N.Y. 2010) (waiver of privilege based on assertion of having "acted in good faith at all times" and thoughts and mental impressions of patent prosecution counsel); *see also Willy v. Admin. Review Bd.*, 423 F.3d 483, 497 (5th Cir. 2005) ("[W]hen a party entitled to claim the attorney-client privilege uses confidential information against his adversary (the sword), he implicitly waives its use protectively (the shield) under that privilege."); *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 732 F. Supp. 2d 653, 660 (N.D. Tex. 2010) ("In responding to Highmark's arguments, Allcare was not entitled to at once rely on the opinion of counsel to justify its filing of counterclaims but withhold the details of counsel's pre-filing efforts – the sort of details that would allow the Court to verify the adequacy of counsel's efforts – based on privilege.").

        **C.    Plaintiff's Assertion Of A "Mistaken Description" Of Figure 6 In The Patents And Partial Disclosure Of Related Attorney-Client Communications Waives Privilege**

As explained in Medtronic's letter brief detailing why the patents-in-suit are invalid under 35 U.S.C. § 102(b) (Dkt. 49-1), the patents' specifications include a figure which depicts the results of a surgery performed using the alleged patented invention: "FIG. 6 is a three frame x-ray view showing 'before and after' views of a scoliosis patent who was treated in an investigational procedure *using the system and method of the present invention*." (U.S. Patent No. 7,670,358 at 4:38-43 (Ex. H); U.S. Patent No.7,776,072 at 4:41-46 (Ex. I); U.S. Patent No. 8,361,121 at 4:44-49 (Ex. J), respectively (emphasis added)). Moreover, Plaintiff previously admitted that the surgery that resulted in the x-rays depicted in Figure 6 was performed more than one year before the asserted patents' earliest claimed priority date of December 30, 2004.[8]

---

[8] The surgery that resulted in the x-rays depicted in Figure 6 was one of the 21 prior art surgeries discussed in the IMAST publication.

(Email from Jim Reed to Richard Pettus (Mar. 12, 2015) ("[T]he x-rays depicted in Figure 6 were taken on or about July 10, 2003, and the surgery was performed June 10, 2003.")) (Ex. K).

After recognizing that the 21 prior art surgeries constitute invalidating prior public uses based upon these admissions, Dr. Barry argued (for the first time) in his amended interrogatory responses that Figure 6 was "mistakenly and inadvertently described as using my invention . . . ." (Plaintiff's First Interrogatory Responses at 6) (Ex. G). Dr. Barry tried to support this assertion by disclosing some, but not all, of his communications with counsel regarding this alleged "mistake":

> The first discussions regarding the possibility – and then later confirmation – of the mistake were held at that time. Prior to March 2015, neither Dr. Barry, nor any of his counsel, were aware of the mistaken description of Figure 6. The mistake was thereafter confirmed by comparing the x-rays depicted in Figure 6 with the x-rays taken in July 2003, approximately one month after the subject surgery.

(Plaintiff's Second Interrogatory Responses at 13-14) (Ex. E). But, despite relying on the determination by Dr. Barry and his counsel of this alleged "mistake," Plaintiff is still trying to use the attorney-client privilege as a shield to block inquiry into the basis for making this claim:

> Q. Are you in possession – "you" meaning the Gray Reed law firm – of a document which shows that the Figure 6 surgery did not use the method and apparatus of the invention as you've now told Medtronic?
> A. If the firm has that document, I am not aware of it.
> Q. What are you relying on to now say what you told the patent office ten years ago and then again, you know, the next year when you filed the – the second application and then five years later when you filed the third application, what information are you relying on to take the position that it's incorrect what you told them in the first place?
> A. *Information provided by our client that is privileged that came subsequent to these patents. And, yes, there's a factual basis. Of course there is.*
>     \*                           \*                           \*
> Q. And when you filed the patent application back in 2004, did you ask Dr. Barry for documents that would confirm that it [the Fig. 6 surgery] was a use of the invention?
> A. *I don't believe I can answer that question because of privilege.*
> Q. Did you ask [him] when the surgery took place?

> A. I don't believe I can answer that question because of attorney-client privilege.
>
> \* \* \*
>
> Q. I'll ask again, what facts do you have that – can you tell us today that remove the Figure 6 surgery from 102(b)?
>
> A. How many – is this three times you've asked that? *I cannot tell you any facts that are not subject to privilege at this time.* Our position on that will be made evident in response to your letters relating to summary judgment. *But right now, I'm not going to testify as to our legal analysis or our work product relating to that.*

(Henry Dep. Tr. at 159:17-160:9, 172:14-21, 174:1-10 (emphasis added)) (Ex. C). The law, however, is clear: "when a party defends its actions by disclosing an attorney-client communication, it waives the attorney-client privilege *as to all such communications regarding the same subject matter.*" *In re Echostar Comm'ns Corp.*, 448 F.3d 1294, 1301 (Fed. Cir. 2006) (emphasis added). Dr. Barry's assertion of a supposed "mistake" with respect to the description of Figure 6 – a "mistake" that he has still not corrected in any of the issued patents or in the pending patent application where the same "mistake" appears[9] – has placed the subject matter regarding the alleged "mistake" at issue and thereby waived privilege through his reliance on that assertion. *See Regents of the Univ. of Cal.*, 2007 WL 2069946, at \*3 ("A litigant cannot place into issue privileged matters and also claim that what has been placed into issue still remains privileged and not subject to full disclosure."); *see also UUSI, LLC v. United States,* 121 Fed. Cl. 218, 225-26 (2015) ("The 'at-issue' waiver applies where the privilege holder makes assertions, the truth of which can only be assessed by the examination of the privileged communications.").

In short, Dr. Barry and his counsel have made their choice – they "may have their shield but may not have their sword and wield it, too." *Echometer Co. v. Lufkin Indus., Inc.,* 2002 WL 87323, at \*1 (N.D. Tex. Jan. 16, 2002) (holding that plaintiffs will waive the attorney-client

---

[9] Despite the failure by Dr. Barry to correct this alleged "mistake," Mr. Henry acknowledged at his deposition that there is a legal requirement to do so. (*See* Henry Dep. Tr. at 146:9-147:5) (Ex. C).

privilege if they assert a "good faith" defense to a charge of inequitable conduct); *The Medicines Co. v. Mylan Inc.*, 936 F. Supp. 2d 894, 904 (N.D. Ill. 2013) ("[Plaintiff's] assertion that Ben Venue did not follow the New Process with regard to Lot No. 1344985 might be correct. [Plaintiff] may not, however, buttress this assertion with a sliver of privileged communication while shielding the rest from discovery."). Accordingly, Plaintiff should be compelled to produce all communications with counsel regarding the alleged "mistake" of Figure 6.

> D. **Plaintiff's Waiver Should Also Extend to Dr. Barry's Original Litigation Counsel And to the Pending Prosecution**

As explained above, Plaintiff initially elected to use the law firm (Gray Reed) that prosecuted the patents-in-suit as its litigation counsel in this action. Moreover, Mr. Henry, one of the prosecuting attorneys – who was also a member of the litigation team until the Court granted Medtronic's Motion to Disqualify – admittedly discussed the inequitable conduct issues with the rest of the litigation team at Gray Reed in order to devise legal strategy. (Henry Dep. Tr. at 50:20-54:17) (Ex. C). Based upon such discussions, the scope of Plaintiff's waiver should extend to his litigation counsel at Gray Reed. In fact, the Eastern District of Texas addressed this very issue in *eTool Dev., Inc. v. National Semiconductor Corp.*, where the plaintiff's trial counsel had discussed the disclosure of prior art to the PTO with prosecution counsel (all of whom worked at the same law firm):

> Norman Norris (a former shareholder with Woodcock Washburn LLP) and Michael Swope (a current shareholder at Woodcock Washburn LLP) prosecuted the application that ultimately issued as the '919 patent. *eTool does not deny that according to its privilege log, Steven Rocci, a member of its trial team at Woodcock Washburn LLP, communicated and consulted with the prosecuting attorneys during the prosecution of the '919 patent.* Specifically, eTool does not deny that during the same period of time in which Mr. Norris was prosecuting the '919 patent and conducting extensive research regarding disclosure of possibly material prior art, Mr. Rocci and Mr. Norris (among other Woodcock Washburn LLP lawyers) had a series of meetings and written communications regarding "patent litigation" and "damages."

No. 2:08-CV-196-DF, at 6-7 (E.D. Tex. Nov. 29, 2011) (Dkt. 277) (emphasis added) (Ex. L). Recognizing that such communications "have the potential to cast doubt on the credibility of eTool's advice of counsel and good faith defenses," the court concluded that "the scope of the implied waiver extends to work-product and privileged communications between trial counsel at Woodcock Washburn LLP and prosecution counsel related to the disclosure and/or non-disclosure of material information to the PTO during the prosecution of the '919 patent and the applications that are continuations of the '919 patent." *Id.* at 7; *see also Tyco Healthcare Group LP v. E-Z-EM, Inc.*, 2010 WL 2079920, at *2-3 (E.D. Tex. May 24, 2010) (concluding that "waiver [of the attorney-client privilege] extends to communications with trial counsel where, as here, trial counsel and opinion counsel belong to the same law firm and opinion counsel is an active member of the trial team") (cited in *eTool*, No. 2:08-CV-196-DF, at 6).[10]

In fact, in denying eTool's motion for reconsideration of Magistrate Judge Craven's decision, Federal Circuit Judge Bryson agreed that the waiver extended to litigation counsel:

> Because litigation counsel were apparently involved in the prosecution of that patent, either directly or by advising and consulting with prosecuting counsel on matters relating to the prosecution, communications to and from litigation counsel are within the scope of the order if they occurred during the prosecution of the '919 patent and pertained to questions regarding the disclosure of prior art to the PTO.

*eTool Dev., Inc v. Nat'l Semiconductor Corp.,* 2011 WL 12677163, at *2 (E.D. Tex. Dec. 12, 2011).

Additionally, because the same inequitable conduct allegations exist as to Dr. Barry's pending prosecution, the scope of the privilege waiver should extend to that application as well:

---

[10] The fact that trial counsel at Gray Reed was not forthright with the Court about the existence of the pending related patent application, or their ongoing involvement in that pending prosecution is an additional reason to extend the waiver to trial counsel. *See In re Seagate Tech., LLC*, 497 F.3d 1360, 1374-75 (Fed. Cir. 2007) ("[T]rial courts remain free to exercise their discretion in unique circumstances to extend waiver to trial counsel, such as if a party or counsel engages in chicanery.").

> The Court also rejects eTool's argument that the waiver does not extend to communications with counsel occurring *during the prosecution of the applications that are continuations of the '919 patent.* Waiver extends to "all other communications relating to the same subject matter." Here, the disclosure presented in the continuation applications must be the same as that of the '919 patent – that is, the continuation applications may "not include anything which would constitute new matter if inserted in the original application." As such, any material prior art that was disclosed to the PTO during the prosecution of the pending continuation applications would also be material prior art to the '919 patent. The Court, therefore, concludes that the implied waiver extends to work-product and privileged communications related to the disclosure and/or non-disclosure of material information to the PTO during the prosecution of the applications that are continuations of the '919 patent.

*eTool Dev., Inc.*, No. 2:08-CV-196-DF, at 5 (Ex. L) (citations omitted); *see also eTool Dev., Inc.*, 2011 WL 12677163, at *2 (agreeing that the pending continuation patent application was "pertinent to" the defendant's claim inequitable of conduct with respect to the patent-in-suit). Accordingly, as this Court previously held in the *eTool* case, Plaintiff's waiver of privilege should also extend to his original litigation counsel and to the pending prosecution.

## II. CONCLUSION

For all of the foregoing reasons, Medtronic respectfully requests an order compelling Plaintiff to provide full and complete responses to its discovery requests, including Interrogatory No. 16, as well as all related communications, documents, testimony and information that concern or relate to the inequitable conduct issues herein, including with respect to the IMAST publication and the 21 prior art surgeries described therein.

Dated: December 23, 2015                                     Respectfully submitted,

                                                             **GREENBERG TRAURIG, LLP**


                                                     By:    */s/ Allan A. Kassenoff*
                                                             Mary-Olga Lovett
                                                             Texas Bar No. 00789289
                                                             Southern District of Texas Bar No. 17743
                                                             1000 Louisiana Street Suite 1700
                                                             Houston, TX 77002

E-Mail: lovettm@gtlaw.com
Telephone: (713) 374-3500
Facsimile: (713) 374-3505

Scott J. Bornstein
E-Mail: bornsteins@gtlaw.com
Richard C. Pettus
E-Mail: pettusr@gtlaw.com
Allan A. Kassenoff
E-Mail: kassenoffa@gtlaw.com
GREENBERG TRAURIG, LLP
MetLife Building
200 Park Avenue
New York, New York 10166
Telephone: (212) 801-9200
Facsimile: (212) 801-6400

**ATTORNEYS FOR MEDTRONIC, INC.**

**CERTIFICATE OF CONFERENCE**

On December 21, 2015, Scott Bornstein, on behalf of Medtronic, conferred by teleconference with Sean DeBruine, on behalf of Dr. Barry. On the call, it was confirmed that Dr. Barry plans to oppose the present motion. Accordingly, notwithstanding the good faith meet and confer, the efforts to resolve this issue are at an impasse and requires court intervention.

            */s/ Allan A. Kassenoff*
              Allan Kassenoff

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a) on December 23, 2015.

/s/ *Hector Perez*
Hector Perez
